**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

DAVID LERMA,

                      Petitioner,

v.

RALPH DIAZ, Secretary,

                      Respondent.

Case No.:  17cv1925 LAB (RBB)

**(1) ORDER DENYING REQUEST FOR EVIDENTIARY HEARING AND**

**(2) REPORT AND RECOMMENDATION RE DENIAL OF THIRD AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

## I.    INTRODUCTION

Petitioner David Lerma ("Petitioner" or "Lerma"), a state prisoner proceeding pro se, has a Third Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 pending before this Court.  There, he challenges his San Diego Superior Court conviction in case number SCN315179.  (Third Am. Pet. 1, ECF No. 8.)  Lerma also requests an evidentiary hearing.  (Id. at 11.)  The Court has reviewed the Third Amended Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the lodgments, and all the supporting documents submitted by both parties.  For

/ / /

the reasons discussed below, the Court **DENIES** Petitioner's request for an evidentiary hearing and **RECOMMENDS** that the Petition be **DENIED**.

## II. FACTUAL BACKGROUND

### A. Prosecution Case

A.R., the victim in this case, was born in August 1998. (Not. Lodgment Attach. #4 Rep.'s Tr. vol. 2, 179, Jan. 8, 2014, ECF No. 13.) At the time of trial, A.R. was 15 years old. (Id. at 114.) A.R.'s mother, Aisha, met David Lerma in 2004 and married in 2005. (Id. at 68, 71.) At the time, Aisha was in a relationship with a man named Marco. Shortly after meeting Lerma, Aisha ended her relationship with Marco and began dating Lerma. (Id. at 67-68, 118-19.)

A few months later, Lerma moved into Aisha's one bedroom mobile home. (Id. at 69, 119-20.) Although A.R. had her own bed, the three all slept in the bedroom. (Id. at 69-70.) Lerma and Aisha married in April 2005. (Id. at 70-71.) Over time, Lerma and A.R. developed a father-daughter relationship, and A.R. began calling Lerma "Dad." (Id. at 65-72, 76-77, 179, 183, 221-23.)

#### 1. A.R.'s Trial Testimony About the Abuse

At trial, A.R. testified that when she was about eight, she was asleep in her bed and woke up to find Lerma's hand on her vagina over her clothes. (Id. at 130-32.) After she woke up, Lerma removed his hand. (Id. at 131-32.) He then walked out of the bedroom without saying anything. (Id. at 133.) A.R. went back to sleep. (Id.)

On another occasion when A.R. was eight or nine, and the family was still living in the one bedroom mobile home, A.R. was getting ready to take a shower. (Id. at 125, 128.) She was in the bedroom naked. (Id. at 125-26.) Lerma came into the bedroom, led her to the bed, and put a pillow over her face. (Id. at 126.) He touched her vagina with his fingers and then licked her vagina with his tongue. (Id. at 127.) Lerma did not say anything; when he was done, A.R. took a shower. (Id. at 127, 129.)

/ / /

/ / /

When A.R. was about ten years old, she, her mother, and Lerma moved to a two bedroom mobile home; there, A.R. had her own bedroom. (<u>Id.</u> at 71.) One evening, after they had moved, A.R. was not wearing any clothes and about to step into the shower when Lerma came into her bedroom, which was connected to the bathroom. (<u>Id.</u> at 136, 143.) He pulled A.R. out of the bathroom, laid her on the bed, and put a pillow over her face. He rubbed her vagina with his fingers and then licked her vagina. (<u>Id.</u> at 136-40.) He asked her if she liked his finger or his tongue better. (<u>Id.</u> at 139.) She did not answer. (<u>Id.</u> at 140.) He stopped when the telephone rang; A.R. then got up and took a shower. (<u>Id.</u> at 140-42.)

A few months after the third incident, Aisha and Lerma separated, and Lerma moved out of the mobile home. (<u>Id.</u> at 78-79, 144.) A.R. was ten years old and in the fifth grade when Lerma moved out. (<u>Id.</u> at 150.) A.R. and Lerma stayed in contact after Aisha and Lerma divorced. The two communicated over the phone and through text messages. (<u>Id.</u> at 151.) A.R. visited Lerma on several occasions. (<u>Id.</u> at 151-52.)

When A.R. was eleven or twelve years old, she went to visit Lerma at the townhouse he was sharing with his then girlfriend, Jennifer, and Jennifer's five-year-old son, Marco. (<u>Id.</u> at 152-53, 155, 161.) It was A.R.'s first visit with Lerma after he and her mother divorced; while A.R. was there, Jennifer left to go somewhere. (<u>Id.</u> at 153.) A.R. and Lerma were sitting on the bed in the master bedroom while Lerma played video games and A.R. watched. (<u>Id.</u> at 155.) At one point, Lerma unbuckled his pants, put a blanket over himself, grabbed A.R.'s hand, and made her touch his penis. (<u>Id.</u> at 154-55, 157.) She did not see Lerma's penis but she felt it outside the opening of his boxer shorts. (<u>Id.</u> at 157.) He held his hand over hers and made it go up and down his penis; he ejaculated and let go of her hand. (<u>Id.</u> at 158-60.) He zipped up his pants, and A.R. washed her hands in the bathroom. (<u>Id.</u>) Lerma did not say anything during the incident. (<u>Id.</u> at 160-61.) He later drove A.R. back to her grandmother's home. (<u>Id.</u> at 162-63.)

A.R. testified that on Father's Day, she visited Lerma again; she was twelve years old. At that time, Lerma and Jennifer were living in a second townhome in Vista,

California. (Id. at 163-64, 167.) A.R. and Lerma were sitting on his bed, and Lerma pushed her so that she was lying down on the bed. (Id. at 166.) He pulled A.R.'s pants and underwear down to her ankles, touched her vagina with his fingers, and rubbed her chest over her shirt; Lerma stopped and A.R. put her pants back on. (Id. at 166-68.) Lerma then got off the bed and stood in front of her. (Id. at 168.) He dropped his pants to his ankles, and his penis was outside the hole of his boxer shorts. This was the first time A.R. saw his penis; Lerma put her hand on it and she "play[ed]" with it until he ejaculated. (Id. at 169-70.) He did not say anything; afterward, A.R. washed her hands in the bathroom. (Id. at 170.) Lerma later drove A.R. back to her grandmother's house. (Id. at 171.)

A.R. testified that during the summer of 2010, when she was twelve years old, she, Lerma, Jennifer, and Jennifer's son all went to Legoland.[1] (Id. at 172.) At trial, she stated that, after Legoland, Lerma took her home to her grandmother's house. (Id. at 173.)

On another occasion during the summer of 2010, A.R. again went to the townhouse Lerma and Jennifer shared; Jennifer and Lerma were both there. (Id. at 174-75.) They all went to the pool together. (Id. at 174.) Later, A.R. and Lerma were in his bedroom watching television; Jennifer was in the living room. (Id.) Lerma took off A.R.'s pants and touched her vagina with his fingers. (Id. at 176.) Lerma was lying on the bed; he had taken his pants off and was covering himself with a blanket. (Id. at 176-77.) He took A.R.'s hand and moved her hand up and down on his penis until he ejaculated. (Id. at 177.) Lerma put his pants back on; A.R. stayed for dinner; and Lerma drove her home after. (Id. at 178.)

/ / /

---

[1] In statements A.R. made prior to trial, she had described an incident occurring on the same day as the Legoland visit. (Not. Lodgment Attach #4 Rep.'s Tr. vol. 2, at 240-41, ECF No. 13.) A.R. was not able to recall that incident at trial. (Id. at 242.) Some of her previous statements about that day were also entered into evidence and are discussed in Section V(A) of this Report and Recommendation. (Id. at 240-42; see also Not. Lodgment Attach. #5 Rep.'s Tr. vol. 3, 274, Jan. 9, 2014, ECF No. 13.)

The last time A.R. visited Lerma was in April 2012, when she was thirteen. (Id. at 179.) A.R. went to have dinner with Lerma, Jennifer, and Jennifer's son, and to meet Lerma and Jennifer's new baby girl. (Id.) Jennifer was in the bedroom with the baby, and A.R. was seated at the dining room table. (Id. at 181-82.) Lerma tried to touch A.R.'s vagina over her pants. (Id.) She pushed his hand away. (Id. at 182.) Later, in the living room, Lerma pushed A.R. onto the couch and started "humping [her] butt." (Id. at 180, 183.) She pushed him off. (Id. at 183.) Later, everyone ate dinner together and watched television in the living room. (Id. at 183.) Lerma told A.R. to get a video game from the bedroom; he followed her there and tried to get on top of her. (Id. at 184.) She pushed him off and said "no." (Id.) Lerma got up and they both went back to the living room and played video games; shortly thereafter, he drove A.R. home. (Id. at 184.)

2.     A.R. Reports Abuse

A.R. had been attending counseling sessions on and off since she was about four years old to help her with issues arising from her parents' divorce. (Id. at 92-93, 189, 192.) During one session, when A.R. was eight or nine years old, she told her counselor about an incident when she woke up to find her mother's former boyfriend, Marco, touching her inappropriately.[2] (Id. at 92, 188-89, 192.) The counselor notified A.R.'s mother and the police. (Id. at 94-95, 191-92.) Police informed Aisha that Marco was no longer in the country, having been previously deported, and there was no further investigation. (Id. at 95.)

At trial, A.R. testified that she later realized that it was not Marco who had touched her inappropriately, but Lerma. (Id. at 190-91.) A.R. stated that when her mother was dating Marco, A.R. had slept in a toddler bed. (Id.) When Lerma moved in with A.R. and her mother, he purchased a twin sized bed for A.R. (Id. at 190, 199, 210-11.) A.R. testified that when she was ten or eleven, she deduced that it was Lerma, and not Marco,

---

[2] Aisha testified that A.R. had not seen Marco since A.R. was four years old. (Not. Lodgment Attach. #4 Rep.'s Tr. vol. 2, at 93-94, ECF No. 13.)

who had touched her.  (Id. at 194.)  When she saw a photograph of herself in the twin-sized bed Lerma had bought her, she realized that it was Lerma who had touched her while she was sleeping.  (Id. at 194, 196.)  A.R. did not tell her mother that she had mistakenly blamed Marco for touching her inappropriately because she was worried Aisha would overreact; by then they had already been living with Lerma.  (Id. at 194-95.)

In May 2012, about a month after her last visit with Lerma, A.R. told her mother that Lerma had been touching her inappropriately.  (Id. at 83-85, 197-98, 230-31.)  A.R. also told Aisha that it was Lerma, not Marco, who had touched her inappropriately while she was sleeping.  (Id. at 196-97.)  Aisha contacted the police.  (Id. at 85.)

In June 2012, a licensed social worker, Laurie Fortin, conducted a forensic interview with A.R.  (Id. at 248-49.)  During the interview, A.R. stated that when she was three or four, Marco would "do stuff to me like touch me . . . when I was little."  (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 271, 280, ECF No. 13; see also Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 1, ECF No. 15.[3])

A.R. also recounted Lerma's conduct over the years, including instances when he covered her face with a pillow and touched her inappropriately.  (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 280, 287-88, ECF No. 13; see also Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 4, ECF No. 15.)  She reported an incident when she was about to get in the shower and Lerma pulled her onto the bed and touched her vagina with his fingers and licked her vagina.  (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 290-92, ECF No. 13; see also Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 6-8, ECF No. 15.)  Lerma asked A.R. if she liked it, and she said "no;" he continued touching her until the phone rang.  (Not. Lodgment Attach. #2 Clerk's Tr. vol.

---

[3] In the copy of volume one of the clerk's transcript lodged with this court, several pages of testimony relating to the forensic interview were missing or illegible.  Respondent submitted those pages as a supplemental lodgment [ECF No. 15].  The page numbers for the supplemental lodgment refer to those imprinted by the court's electronic case filing system and correspond to the Bates stamp page numbers of the missing or illegible pages referenced from the clerk's transcript.

17cv1925 LAB (RBB)

2, at 290, ECF No. 13; <u>see also</u> Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 6, ECF No. 15.)

A.R. told Fortin that after her mother and Lerma divorced, the abuse continued on occasions when she visited Lerma: He would lower her pants to her ankles, pull her onto the bed, and touch her vagina. (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 287, 292-93, ECF No. 13; <u>see also</u> Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 8-9, ECF No. 15.) Lerma would then unbuckle his pants and, while covering himself with a blanket, grab her hand and make her touch his penis. (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 292-93, ECF No. 13; <u>see also</u> Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 4-5, 8-9, ECF No. 15.)

A.R. told Fortin that she saw Lerma's penis one time when he "pushed her down and opened [her] legs" and tried to "put it inside [her]." (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 293-94, ECF No. 13; <u>see also</u> Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 9-10, ECF No. 15.) She told him no and resisted; A.R. also stated that Lerma tried to put his fingers inside her which was painful, and he tried to put his penis inside her two or three times. (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 294, ECF No. 13; <u>see also</u> Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 10, ECF No. 15.)

3.     Interviews of Lerma

On September 14, 2012, Detective Licudine interviewed Lerma at his home. (Not. Lodgment Attach #1 Clerk's Tr. vol. 1, at 178-234, ECF No. 13; <u>see also</u> Not. Lodgment Attach #5 Rep.'s Tr. vol. 3, 284-86, 293, Jan. 9, 2014, ECF No. 13.) Lerma repeatedly denied touching A.R. inappropriately. (Not. Lodgment Attach. #1 Clerk's Tr. vol. 1, 197-98, 200, 202-04, 207-10, ECF No. 13.) Petitioner told Detective Licudine that he continued his relationship with A.R. after he ended his relationship with Aisha. (<u>See</u> <u>id.</u> at 185-86.) He stated that during her last visit, they ate dinner and played video games at his house. (<u>Id.</u> at 187-89.) He mentioned that on another occasion A.R. cried when she wanted a birthday present from him and he told her that he could not afford to take her

shopping anymore because he needed the money to buy necessities for his new baby. (Id.)

Detective Licudine told Lerma that A.R.'s allegations included that he put his mouth on her vagina multiple times, she gave him a "blowjob" on multiple occasions, he attempted to penetrate her vagina multiple times, and he touched her inappropriately on several occasions. (Id. at 197-200, 202-03.) Lerma denied it. (Id.) Detective Licudine suggested that Lerma's DNA was in A.R.'s vagina and mouth.[4] (Id. at 198-99.) He responded that his DNA should not be in A.R.'s vagina or in her mouth, "period." (Id. at 199.) Detective Licudine told Lerma that the only way to clear his name was to pass a polygraph test, and he agreed to take it. (Id. at 198-201.)

On October 2, 2012, Lerma sat for a polygraph test at the San Diego Sheriff's Department. (Not. Lodgment Attach. #5 Rep.'s Tr. vol. 3, at 298, ECF No. 13.) During the test, Lerma denied having any sexual contact with A.R. (Id. at 298-300; Not. Lodgment Attach. #1 Clerk's Tr. vol. 1, at 254, 257-59, ECF No. 13.) He specifically denied each of the allegations made by A.R. (Not. Lodgment Attach. #1 Clerk's Tr. vol. 1, at 254, 257-59, ECF No. 13.)

In a conversation with the polygraph examiner, Lerma admitted that he had A.R. masturbate him, he grabbed her butt underneath her clothes three to four times, he touched her breast over her clothes four times, he touched her vagina over her clothes one time, and he inserted his finger in her vagina once. (Not. Lodgment Attach. #1 Clerk's Tr. vol. 1, at 261-62, 267; see also Not. Lodgment Attach. #6 Rep.'s Tr. vol. 4, 448-49, 452-53, Jan. 13, 2014, ECF No. 13.) Lerma told the polygraph examiner that sexual contact took place only on the couch and not in the bedroom or shower. (Not. Lodgment Attach. #1 Clerk's Tr. vol. 1, at 264-65, ECF No. 13.) The examiner asked Lerma why

/ / /

---

[4] Law enforcement did not have any such DNA evidence. Detective Licudine testified that this is a common law enforcement interrogation technique used to "try to obtain a confession from [Lerma] or an explanation." (Not. Lodgment Attach. #4 Rep.'s Tr. vol. 2, at 293-94, ECF No. 13.)

he did not mention the sexual contact during the polygraph; he replied that he was afraid that he would go to jail and lose his family.  (Id. at 267, 269.)

B.    Defense Case

Lerma's defense at trial was that he did not commit any of the sexual acts described by A.R. and that he was being wrongfully accused.  His fiancée, Jennifer, testified that when A.R. visited their home, she was never alone with Lerma.  (Not. Lodgment Attach. #5 Rep.'s Tr. vol. 3, at 324, ECF No. 13.)  Jennifer testified that she never heard Lerma say anything sexual to A.R. and never saw anything inappropriate between the two; she stated that A.R. was "clingy" with Lerma.  (Id. at 324, 326.)  A.R. never gave Jennifer the impression that she was being molested.  (Id. at 326.)

Lerma testified in his own defense.  He stated that, other than spanking A.R.'s bottom in a playful manner over her clothes, he did not do anything sexually inappropriate to her.  (Id. at 387-88; Not. Lodgment Attach. #6 Rep.'s Tr. vol. 4, at 464-65, ECF No. 13.)  He told the polygraph examiner that he had acted inappropriately because the examiner would not accept his denials so he "gave in."  (Not. Lodgment Attach. #5 Rep.'s Tr. vol. 3, at 388, ECF No. 13.)  Lerma was also afraid that Child Protective Services would take his baby into foster care.  (Not. Lodgment Attach. #6 Rep.'s Tr. vol. 4, 434-35, Jan. 13-17, 2014, ECF No. 13.)  He believed A.R. accused him of abusing her because she thought he did not love her anymore after the arrival of his new baby and because he did not buy her gifts anymore.  (Id. at 411-12, 419-21.)

## III.    PROCEDURAL BACKGROUND

On May 21, 2013, the San Diego District Attorney's Office filed an information charging Lerma with oral copulation/sexual penetration of A.R., a child ten years old or younger, between September 21, 2006 and August 13, 2009 (count one), in violation of California Penal Code section 288.7(b).  (Not. Lodgment Attach. #1 Clerk's Tr. vol. 1, at 6-7, ECF No. 13.)  It further alleged five additional counts of committing lewd acts upon A.R., then a child under fourteen years of age, between August 14, 2009 and August 13, 2012 (counts two, three, four, six, and seven), in violation of California Penal Code

section 288(a).  (Id. at 7-9.)  Additionally, the information alleged one count of committing a forcible lewd act on A.R. (count five), in violation of California Penal Code section 288(b)(1).  (Id.)  As to counts two through six, it was further alleged that Lerma had substantial sexual conduct with A.R.  (Id. at 7-8.)

Lerma's jury trial began on January 6, 2014.  (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 350, ECF No. 13; see also Not. Lodgment Attach. #3 Rep.'s Tr. vol. 1, 49, Jan. 6 & 7, 2014, ECF No. 13.)  On January 9, the court granted Lerma's motion for judgment of acquittal as to counts five and six, under California Penal Code section 1118.1.  (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 359, ECF No. 13; Not. Lodgment Attach. #5 Rep.'s Tr. vol. 3, at 313-14, ECF No. 13.)  The jury began deliberations on the remaining counts on January 13 and deliberations continued for five more days.  (See Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 363-72, ECF No. 13; see also Not. Lodgment Attach. #6 Rep.'s Tr. vol. 4, at 392, 554, 560-66, ECF No. 13.)  On January 21, 2014, the jury found Lerma guilty on counts one, two, four, and seven and not guilty on count three.  (See Not. Lodgment Attach. #1 Clerk's Tr. vol. 1, at 110-14, ECF No. 13.)  It further found that the substantial sexual conduct allegations in counts two and four were true.  (Id.; see also Not. Lodgment Attach. #7 Rep.'s Tr. vol. 5, 568-70, ECF No. 13.)  On February 21, 2014, the trial court sentenced Lerma to twenty-three years to life imprisonment.[5]  (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 377, ECF No. 13; see also Not. Lodgment Attach. #7 Rep.'s Tr. vol. 5 at 580-85, Jan. 21 & Feb. 21, 2014, ECF No. 13.)

Lerma appealed his conviction to the California Court of Appeal.  (See Not. Lodgment Attach. #8 Appellant's Opening Brief, People v. Lerma, D068126 (Cal. Ct. App. [Apr. 14, 2016], ECF No. 13.)  Lerma raised three claims on appeal:  (1) the trial

---

[5] The court sentenced Lerma to a base term of fifteen years to life on count one, six years consecutive on count two, two years consecutive on count four, and three years concurrent on count seven.  (Not. Lodgment Attach. #4 Rep.'s Tr. vol. 5, at 580-84, ECF No. 13; Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 377, ECF No. 13.)

17cv1925 LAB (RBB)

court erred in admitting a portion of A.R.'s forensic interview; (2) trial counsel was ineffective in failing to adequately object to the admission of A.R.'s prior forensic statement; and (3) the trial court erred in failing to sua sponte instruct the jury on a lesser included offense.  (See id. at 2-4.)  On February 23, 2017, the appellate court affirmed Lerma's conviction in a reasoned opinion.   (Not. Lodgment Attach. #11 People v. Lerma, D068126, slip op. (Cal. Ct. App. Feb. 23, 2017), ECF No. 13, as modified by Not. Lodgment Attach. #12 People v. Lerma, D068126, Order Modifying Opinion and Denying Rehearing (Cal. Ct. App. Mar. 21, 2017), ECF No. 13.)

Lerma then filed a petition for review in the California Supreme Court.  (See Not. Lodgment Attach. #13 Petition for Review People v. Lerma, No. S241125 (Cal. [Apr. 6, 2017], ECF No. 13.)  In the petition, Lerma again argued that the trial court erred in admitting A.R.'s prior forensic interview and in failing to sua sponte instruct the jury on a lesser included offense.  (See id. at 4, 27.)  On June 14, 2017, the California Supreme Court denied the petition for review without comment or citation.  (Not. Lodgment Attach. #14 People v. Lerma, No. S241125, Order at 1 (Cal. June 14, 2017), ECF No. 13.)

Lerma, proceeding pro se, filed his Third Amended Petition for Writ of Habeas Corpus on May 10, 2018, and raises two claims [ECF No. 8].  On July 16, 2018, Respondent filed an Answer, a Memorandum of Points and Authorities in Support of the Answer and Lodgments of the state court records [ECF Nos. 11 & 12].  On February 4, 2019, Respondent filed Supplemental Lodgments [ECF No. 15].

## IV.   SCOPE OF REVIEW

Lerma's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable

/ / /

determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C.A. § 2254(d) (West 2006); Early v. Packer, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. See Yarborough v. Gentry, 540 U.S. 1, 4 (2003); Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." See Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases or decided a case differently than the Supreme Court on a set of materially indistinguishable facts. See Bell v. Cone, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. Id. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." See Lockyer v. Andrade, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. See Ylst v. Nunnemaker, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000), overruled on other grounds by Andrade, 538 U.S. at 75-76; accord Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. See Early, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. Id. Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." Andrade, 538 U.S. at 72.

## V. DISCUSSION

Lerma raises two grounds for relief. First, he argues his due process rights were violated when the trial court allowed portions of a pretrial interview with A.R. to be admitted as evidence. (Third Am. Pet. 6-12, ECF No. 8.) Second, Lerma contends that his due process rights were violated when the trial court failed to instruct the jury on a lesser included offense. (Id. at 13-16.) Respondent asserts that Petitioner fails to raise cognizable federal claims, and additionally, the state court's denial of the claims was neither contrary to, nor an unreasonable application of, clearly established federal law. (See Answer Attach. #1 Mem. P. & A. Supp. 6-13, ECF No. 12.)

### A. Admission of Forensic Interview

In claim one, Lerma argues that the trial court violated his right to due process by admitting, as prior inconsistent statements, the portion of A.R.'s pretrial forensic

/ / /

interview during which she stated that Lerma tried to put his penis in her vagina. (Third Am. Pet. 6-12, ECF No. 8.)

1. Background

At trial, A.R. testified under direct examination that she and Lerma went to Legoland during the summer that she was twelve years old. (Not. Lodgment Attach. #4 Rep.'s Tr. vol. 2, at 171-72, ECF No. 13.) When the prosecutor asked her what happened after the outing, A.R. stated that she believed she went home to her grandmother's house. (Id. at 173.) The prosecutor asked again if anything notable happened on the day of her Legoland trip and she responded, "I don't remember. I don't think so." (Id.)

On cross-examination, defense counsel asked A.R. about the Legoland trip. (Id. at 232-33.) She testified that it was a special day which she would remember. (Id. at 233-34.) Defense counsel then read aloud a portion of A.R.'s preliminary hearing testimony during which she described how Lerma tried to put his penis in her vagina on the same day they went to Legoland:

> [A.R.]: And we went to the new house and he went into the bedroom and he was playing video games and Jennifer was in the room with us and he told her to go to the store to go buy something to eat. So she left and it was just me and him alone, and this time he pulled down my pants and my underwear and he pulled down his pants and boxers, and he started playing with my vagina with his fingers and then – he tried to put his penis inside – inside my vagina.
>
> But I told him no. I kept closing my legs, and he kept trying to pull them open, but I kept resisting him and kicking him, and when he told me to let him do it and I told him no and he stopped and I pulled my pants back up and I started crying, and then after that he made me play with his penis, and then after that he pulled down my pants and he start putting his fingers inside me again. I didn't let him. And then I told him I wanted to go back home to my grandma's house. So he took me home.

(Id. at 240.) Defense counsel read another portion of A.R.'s preliminary hearing testimony:

/ / /

Question [Prosecutor]:     I want to go back to the time when you said he tried to put his penis in your vagina back when you were – the day you went to Legoland, okay?  Do you understand which time I'm talking about?

Answer [A.R.]:     Yes.

Question:     Do you remember talking about your vagina hurting?

Answer:     Yes.

Question:     Tell us about that.

Answer:     After he tried to do that, I went to the rest room and I went pee and it burnt and to close my legs it hurt a little bit, and I just felt real uncomfortable, and so I told him to take me home to my grandma's house.

[Question:]  Could you tell why it burned?

[Answer:]  Huh-uh, no.

Question:     At that same time, do you remember telling [Lerma] when he was putting his penis in your vagina that it hurt?

Answer:     Yes.

Question:     Tell us exactly what you said to him while that was happening.

Answer:     I told him to stop.  He said why.  I said because it hurts me, and he said that he wouldn't hurt me, to just let him do that, and I said no and that's when I moved away from him.

(Id. at 241-42.)

Defense counsel next asked A.R. if she remembered testifying at the preliminary hearing that appellant tried to put his penis in her vagina on the day she went to Legoland, and she responded that she did.  (Id. at 242.)  Counsel continued, "But nothing happened the day you went to Legoland?"  A.R. responded, "Right."  (Id.)

/ / /

On redirect examination, the prosecutor asked A.R. to explain why she testified at the preliminary hearing about what Lerma did to her on the day they went to Legoland but failed to mention those things during her direct examination.  (Id.)  The following exchange then occurred:

> [Prosecutor]:  [A.R.], how can you explain that to us?  You did tell us when you testified at the preliminary hearing about all these things happening on the day you went to Legoland, and now when you testified, you didn't tell us about that?

> [A.R.]:        I forgot.

> Q:      You forgot what?

> A:      What happened the day of Legoland.

> Q:      Okay.  But I -- am I correct now?  Okay.  What is correct; did anything happen on the day of Legoland?

> A:      Well, no, I guess not.  Nothing happened.

> Q:      Okay.  So there's nothing to forget.  Help me understand what you mean forgot?

> A:      Well I forgot what happened on the day of Legoland.  The story I said before, I forgot that that incident happened.

> Q:      Okay.  Did that incident happen?

> A:      Yeah, but I -- don't remember if it was the day of Legoland or not.

> Q:      All right.  Well, let me ask you this then.  As you sit here today and you're just thinking about the truth --

> A:      Right.

> Q:      -- thinking about things that actually happened -- I'm not asking what you said, just asking what actually happened.

1   A:   Right.

2   Q:   Was there ever a time where when [sic] [Lerma] tried to put his

3   penis in your vagina?

4   A:   Yes.

5
6   Q:   Why didn't you say that when you testified all of today?

7   A:   I forgot.

8   Q:   When did this happen?

9
10  A:   I don't remember.

11  Q:   Why is it that when you testified at the preliminary hearing you

12  said it happened on the day you went to Legoland?

13  A:   I don't know because I remember it happened on the day of

14  Legoland, and this time I didn't remember.

15  Q:   Okay.  So what do you think is the truth, that nothing

16  inappropriate happened on the day of Legoland or that it did?

17  A:   That incident did happen but I'm not sure if it did or didn't

18  happen on the day of Legoland.

19  Q:   Do you know -- and it's okay to say you don't know -- do you

20  know how old you were or what grade you were in when he tried to put his

    penis in your vagina?

21
22  A:   I was 12, in seventh grade.

23  Q:   How do you know that?

24
25  A:   Because it was his second town home, and after I was 13 years

    old, I only saw him one more time and that was it.

26
27  Q:   How many times did an incident happen where he tried to put

    his penis in your vagina?

28

A:     Only once.

Q:     Are you sure about that?

A:     Yeah.

Q:     So that only happened once, but you're unsure about the day it happened?

A:     Right.

(Id. at 242-44.)

After A.R.'s testimony, the prosecutor sought to introduce A.R.'s videotaped forensic interview, arguing that it contained both prior inconsistent statements and prior consistent statements. (See id. at 255, 258.) Defense counsel objected, claiming the hearsay exceptions did not apply. (Id. at 255-58.) He argued that the prior consistent statement exception involved situations such as when defense counsel challenges the witness's motive for a statement, and that did not happen in A.R.'s case. (Id. at 256-57.) Further, he asserted that the prior inconsistent statement exception did not apply because there was nothing in the video that was truly different from A.R.'s testimony. (Id. at 257.) Lerma's attorney argued that the interview statement was essentially the same as A.R.'s testimony and it would be improper to allow the prosecutor to bolster his case by introducing the statement. (Id. at 257-58.) He stated that the admission of the videotaped forensic interview was tantamount to allowing A.R. to testify all over again. (Id.)

The prosecutor countered that he was permitted to impeach his own witness with prior inconsistent statements; and A.R.'s initial report, the forensic interview, her preliminary hearing testimony, and her trial testimony showed she made a number of inconsistent statements. (Id. at 258-59.) Thus, he argued, the jury should hear her video statements to assess her credibility. (Id. at 260-62.)

The trial court ultimately ruled the forensic interview was admissible as prior inconsistent statements. (Not. Lodgment Attach. #5 Rep.'s Tr. vol. 3, at 264-69, ECF

No. 13.)  The court found that statements in the forensic interview were inconsistent with A.R.'s testimony on direct examination, during which A.R. failed to mention her previous claims that Lerma had attempted to penetrate her.  The judge also found that A.R.'s testimony on redirect that the attempted penetration happened only once was inconsistent with her forensic interview statement, in which she stated it happened "up to three times."  (See id. at 267-69; see also Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 10, ECF No. 15.)   Moreover, the trial court found that A.R.'s forensic interview statement suggesting that Marco was responsible for the first touching incident was inconsistent with her trial testimony that it was Lerma.  (Not. Lodgment Attach. #5 Rep.'s Tr. vol. 3, at 266-69, ECF No. 13.)   The trial court noted that A.R. was subject to being recalled as a witness.  (Id. at 272.)

The taped forensic interview was played for the jury.  (Id. at 274.)  During the interview, A.R. described Lerma's attempts to penetrate her with his penis.  She stated that Lerma had pushed her on the bed and "opened" her legs.  She told Lerma "no, it hurts" but Lerma said "let me just do it slowly and I won't hurt you," but she would not let him.  (Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 9-10, ECF No. 15.)   She stated that Lerma tried to put his penis inside her "two to three times." (See id.)

## 2.    California Court of Appeal Decision

Lerma raised this claim in his petition for review to the California Supreme Court. (See Not. Lodgment Attach. #13 Petition for Review, People v. Lerma, No. S241125 at 25-26, ECF No. 13.)  The court denied the petition without comment or citation.  (Not. Lodgment Attach. #14 People v. Lerma, No. S241125, Order at 1, ECF No. 13.) Accordingly, this Court looks through to the last reasoned state court opinion, that of the California Court of Appeal.  See Ylst, 501 U.S. at 805-06.

On appeal, Lerma argued that the admission of the forensic interview recording was a violation of California rules of evidence and the Due Process Clause of the U.S. Constitution.  (See Not. Lodgment Attach. #8 Appellant's Opening Brief at 2, People v.

Lerma, D068126, ECF No. 13.)   The appellate court found no error.  In its decision, the court concluded that the evidence was properly admitted as a prior inconsistent statement. (See Not. Lodgment Attach. #12 People v. Lerma, D068126, Order Modifying Opinion and Denying Rehearing at 3, ECF No. 13.)  Specifically, the court noted that during her forensic interview, A.R. stated that Lerma had attempted to penetrate her on two or three occasions, including the day of the Legoland visit.  At trial, A.R. testified initially that nothing notable happened the day they went to Legoland.  After being impeached with her preliminary hearing testimony, A.R. recalled that Lerma had attempted to penetrate her on one occasion, but she could not remember when it happened.  This, the appellate court concluded, was inconsistent with A.R.'s forensic interview statement under the requirements of California Evidence Code section 1235;[6] the trial court did not err in allowing the evidence to be admitted.  (See id.)

Further, the appellate court found that even assuming there was error, there was no prejudice.  The court applied the harmless error standard applicable to trial error – whether it is more probable than not that the appellant could have achieved a more favorable outcome in the absence of the error.   (See id. at 3-4 (citing People v. Watson,

_____

[6] California Evidence Code section 1235 states:

Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770.

Cal. Evid. Code § 1235 (West Supp. 2017)  Section 770 of the California Evidence Code, in turn, states:

Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:

(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or

(b) The witness has not been excused from giving further testimony in the action.

Cal. Evid. Code § 770 (West Supp. 2017).

17cv1925 LAB (RBB)

46 Cal. 2d 818, 836, 299 P. 2d 243, 254 (1956)).)  The court stated:

> To the extent that the forensic interview was consistent with [A.R.'s] trial testimony and inadmissible, it was cumulative of her trial testimony and . . . not prejudicial.  In addition, of course, here, the forensic statement was not only cumulative of [A.R.'s] trial testimony, the substance of her statement had also been presented to the jury by Lerma by way of impeachment with A.R.'s preliminary hearing testimony.  Moreover, the incident was not greatly different in character from the oral copulation and other lewd acts [A.R.] described at trial and, thus, not likely to further alienate jurors.
>
> Importantly, there was also substantial corroboration of [A.R.'s] other testimony in the admissions Lerma made to the polygraph examiner.  In sum then, had the videotape been excluded, it is not probable Lerma would have achieved a better result at trial.

(Id. at 4-5.)

The appellate court did not directly address the federal due process aspect of Lerma's claim.  When a state court addresses some of the claims raised by a defendant but not the federal claim, the habeas court should still presume the federal claim was adjudicated on the merits and apply AEDPA deference unless the presumption is rebutted.  Johnson v. Williams, 568 U.S. 289, 293 (2013).  Moreover, if, as here, a petitioner brings a state and federal law claim for the same issue, and the state law "is at least as protective as the federal standard -- then the federal claim may be regarded as having been adjudicated on the merits."  Id. at 301.

3.     Discussion

A federal court is limited in conducting habeas review to deciding whether a conviction violates the Constitution, laws, or treaties of the United States.  28 U.S.C.A. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  The Supreme Court has repeatedly held that the federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law.  See Swarthout v. Cooke, 562 U.S. 216, 220 (2011).  A state court's evidentiary ruling is not cognizable on federal habeas review unless the ruling infringes upon a specific federal constitutional or

statutory provision or deprives the defendant of a fundamentally fair trial as guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  To the extent Lerma argues that the state court misapplied the California Evidence Code's hearsay rule, it is a claim of state law error for which federal habeas relief is not available.

Moreover, the Supreme Court has never held that the admission of hearsay testimony or prior inconsistent statements violates the Due Process Clause.  In California v. Green, 399 U.S. 149, 164 n.15 (1970), the Court stated that while "considerations of due process . . . might prevent convictions where a reliable evidentiary basis is totally lacking," the Constitution is not violated "by the admission of a witness' prior inconsistent statement for the truth of the matter asserted."  Id.  Thus, absent "clearly established" Supreme Court law on the issue of prior inconsistent statements, the California Court of Appeal's denial of the claim cannot have been an unreasonable application of clearly established federal law.  See Carey v. Musladin, 549 U.S. 70, 77 (2006) (holding that "[g]iven the lack of holdings from this Court . . . , it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law'").

Even setting aside the "clearly established law" issue, Lerma's claim is without merit.  Absent violation of a specific constitutional or statutory provision, the due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see also Walters, 45 F.3d at 1357.  A federal writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463

U.S. 880, 899 (1983)), overruled on other grounds by Slack v. McDaniel, 529 U.S. 473 (2000).

"Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process." Jammal, 926 F.2d at 920. Evidence must "'be of such quality as necessarily prevents a fair trial'" for its admission to violate due process. Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)). Even then, habeas relief is not appropriate unless the error had substantial and injurious effect or influence in determining the jury's verdict. See Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

Here, the admission of A.R.'s forensic interview did not render the trial fundamentally unfair because, despite some inconsistencies, nothing about the interview was inherently unreliable. As the state court noted, the forensic interview was conducted on June 7, 2012, a year and a half before the trial, when A.R.'s memory of the specifics would likely have been sharper. (See Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 272, ECF No. 13; Not. Lodgment Attach. #4 Rep.'s Tr. vol. 2, at 49, 112, ECF No. 13.) A.R.'s trial testimony about the day of her Legoland visit was confused and somewhat contradictory. As noted above, she first testified that nothing inappropriate happened the day of the Legoland trip. (Not. Lodgment Attach. #4 Rep.'s Tr. vol. 2, at 173, ECF No. 13.) When defense counsel confronted A.R. with her preliminary hearing testimony that Lerma had molested her and attempted to penetrate her on the day of the Legoland trip, A.R. wavered between explanations. (See id. at 236-41.) She testified both that she had forgotten that it happened and that it did not happen at all. (See id. at 242-44.) She eventually testified that she was sure Lerma had attempted to penetrate her on only one occasion but she could not remember when. (Id. at 244.)

Admission of the forensic interview was relevant to evaluating the reliability of A.R.'s trial testimony and the substance of her allegations. During the interview, she stated that Lerma had attempted to penetrate her on two or three occasions, which was also inconsistent with her trial testimony. (Not. Suppl. Lodgment Attach. #1 [Clerk's

transcript excerpts], at 10, ECF No. 15.)  In addition, A.R. stated during her forensic interview that Marco, her mother's former boyfriend, was responsible for the first incident of alleged molestation.  (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 285-86, ECF No. 13; see also Not. Suppl. Lodgment [Clerk's transcript excerpts], at 3, ECF No. 15.)  This was in contrast to her trial testimony that by the time she was ten or eleven years old, she had deduced that it was Lerma, not Marco, who had touched her inappropriately while she was sleeping.  (Not. Lodgment Attach. #4 Rep.'s Tr. vol. 2, at 194-95, ECF No. 13.)

The admission of the forensic interview did not render the trial fundamentally unfair.  Indeed, it was defense counsel who first to pointed to prior inconsistent statements from A.R.'s preliminary hearing testimony.  (Id. at 233-39.)  At the preliminary hearing, she had stated that Lerma attempted to penetrate her with his penis on the day of the Legoland trip.  (See id. at 239-40.)  Additionally, in his closing argument, defense counsel argued that A.R.'s implication of Marco in the first instance of inappropriate touching undermined her credibility.  (See Not. Lodgment Attach. #6 Rep.'s Tr. vol. 4, at 528-29, ECF No. 13.)  Thus, the forensic interview statement was relevant to arguments of both the prosecution and defense.

While the forensic interview contained some statements inconsistent with A.R.'s trial testimony, a reliable evidentiary basis for the statements was not totally lacking so as to render the trial fundamentally unfair.  There is a reliable evidentiary basis for statements made by a victim to a police officer or social worker shortly after reporting a crime.  See Green, 399 U.S. at 163 n.15 (1970) (stating that the admission of witness's prior inconsistent statement is only a due process violation where "a reliable evidentiary basis is totally lacking").  The jury was capable of evaluating A.R.'s statements and testimony to determine her credibility and reliability.[7]  See Mancuso, 292 F.3d at 956

---

[7] The jury instructions included the following: (1) how to assess the credibility of witnesses, CALCRIM No. 226; (2) how to weigh conflicting evidence, CALCRIM No. 302; and (3) how to view prior

17cv1925 LAB (RBB)

(stating that habeas relief is only warranted when the evidence is "almost entirely unreliable" and the jury would not be "competent to uncover, recognize, and take due account of its shortcomings").  Therefore, admission of the forensic interview as a prior inconsistent statement did not violate Lerma's due process rights, and the state court's denial of the claim was not unreasonable.

Lastly, Lerma appears to also argue that the admission of the forensic interview was a violation of his due process rights because it constituted a knowing admission of false or perjurious testimony.  (Third Am. Pet. 8-9, ECF No. 8.)  He contends that his right to a fair trial was violated and he was "deprived of liberty through a deliberate deception of the court and jury by the presentation of testimony known to be false."  (Id. at 9.)  This aspect of the claim was not presented to the California Supreme Court and is therefore unexhausted.  28 U.S.C.A. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987);  see also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (stating that for a petitioner in California state custody, exhaustion generally means that the petitioner must have fairly presented his or her claims in a petition to the California Supreme Court).

Even if the claim were properly before this Court, Lerma would not be entitled to relief.

The government's knowing use of false or perjured testimony against a defendant to obtain a conviction violates due process.  Napue v. Illinois, 360 U.S. 264, 269 (1959); Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (citing United States v. Agurs, 427 U.S. 97, 103 (1976)).  The result is the same when a prosecutor, "although not soliciting false evidence, allows it to go uncorrected when it appears."  See Napue, 360 U.S. at 269.  But the presentation of conflicting versions of events, without more, does not constitute a knowing presentation of false evidence.  United States v. Geston, 299 F.3d 1130, 1135 (9th Cir. 2002).  To prevail on a Napue claim, (1) the testimony or evidence must be

---

statements, CALCRIM No. 318.  (Not. Lodgment Attach. #1 Clerk's Tr. vol. 1, at 69-70, 73, 75, ECF No. 13.)

17cv1925 LAB (RBB)

false, (2) the prosecution must have known or should have known it was false, and (3) the false testimony must be material. See Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (citing United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003)).

Falsity is not established merely by showing that the witness made an earlier inconsistent statement or that the witness's testimony differs from that of another witness. See Zuno-Arce, 44 F.3d at 1423; see also Geston, 299 F.3d at 1135; Tayborn v. Scott, 251 F.3d 1125, 1131 (7th Cir. 2001) (stating mere inconsistencies in the testimony of a government witness fall short of establishing that the government knowingly used false testimony). "Discrepancies in testimony . . . could as easily flow from errors in recollection as from lies." Zuno-Arce, 44 F.3d at 1423.

Here, Lerma's allegations do not demonstrate a Napue violation because he has not shown that the evidence in question was false or that the prosecutor knew or reasonably should have known it was false. See Mancuso, 292 F.3d at 957 (rejecting Napue claim where there was no evidence prosecutor presented false testimony); Murtishaw v. Woodford, 255 F.3d 926, 959 (9th Cir. 2001) (rejecting claim that prosecution suppressed evidence that witness's testimony was false because petitioner presented no evidence that prosecution knew it was false). The prosecutor questioned A.R. at length about the discrepancies between her statements. (Not. Lodgment Attach. #4 Clerk's Tr. vol. 2, at 242-44, ECF No. 13.) Defense counsel also questioned A.R. about her recollection and her prior statements, specifically about the conflict between her preliminary hearing testimony and trial testimony. (See id. at 234-39.)

While there were some inconsistencies in A.R.'s testimony and statements, there is no evidence in the record that her testimony was false or that the prosecutor knew as much. See Zuno-Arce, 44 F.3d at 1423. And the inconsistencies were explored by both sides. Where there is no evidence that the prosecution knew, or should have known, that a witness's testimony was false, "[a]t most, two conflicting versions . . . [have been] presented to the jury. It [is] within the province of the jury to resolve the disputed testimony." See Geston, 299 F.3d at 1135. Thus, even assuming that Lerma's Napue

17cv1925 LAB (RBB)

claim was properly exhausted, he is not entitled to relief.  See Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (holding that a federal court may deny relief on the merits of an unexhausted claim when it is clear the petitioner has "no chance of obtaining relief").

In sum, the state court's denial of Lerma's claim that his due process rights were violated by the admission of A.R.'s forensic interview as a prior inconsistent statement was neither contrary to, nor an unreasonable application of, clearly established law.  See 28 U.S.C.A. § 2254(d); Williams, 529 U.S. at 407-08.  And to the extent Lerma also argues his due process right was violated by the presentation of testimony, he is not entitled to relief.  See Cassett, 406 F.3d at 624.  Accordingly, the Court **RECOMMENDS** that the claim be **DENIED.**

### B.   Failure to Instruct on Lesser Included Offense

In ground two, Petitioner argues that the trial court should have sua sponte instructed the jury that it could convict him of "attempted sexual penetration," under California Penal Code section 289(a)(1)(B), as a lesser included offense to count one, oral copulation or sexual penetration of a child ten years of age or younger, in violation of California Penal Code section 288.7.   (Third. Am. Pet. 13-16, ECF No. 8.)

Lerma raised this claim in his petition for review to the California Supreme Court. (See Not. Lodgment Attach. #13 Petition for Review, People v. Lerma, No. S241125, ECF No. 13.)  The court denied the petition without comment or citation.  (Not. Lodgment Attach. #14 People v. Lerma, No. S241125, Order at 1, ECF No. 13.)  As such, this Court looks through to the last reasoned state court opinion, that of the California Court of Appeal.  See Ylst, 501 U.S. at 805-06.

In denying the claim, the appellate court noted that under California law, "when a crime may be committed in multiple ways, and it has been charged by the prosecution in multiple ways, [a lesser included offense instruction] is required if one of the ways in which the crime was charged includes all the elements of a lesser offense."  (Not. Lodgment Attach. #12, People v. Lerma, D068126, Order Modifying Opinion and

Denying Rehearing, at 6-8, ECF No. 13 (citing People v. Smith, 57 Cal. 4th 232, 243-44, 159 Cal. Rptr. 3d 57, 66, 303 P.3d 368, 375-76 (2013).)  The appellate court further stated:

> [U]nder Smith, in determining whether it must give an LIO instruction, a trial court must consider two distinct questions:  a) did the accusatory pleading make the lesser crime an LIO; and b) is there evidence in the record from which a jury might find the defendant committed the lesser crime, but not the greater crime.  Under Smith, only if the court answers both questions in the affirmative is it required to give an LIO instruction. (See Smith, supra, 57 Cal.4th at p. 245.)

> Here, section 288.7, subdivision (b) states: "Any person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life."  Section 288a, subdivision (a) defines oral copulation as "the act of copulating the mouth of one person with the sexual organ or anus of another person."  Section 289, subdivision (k)(1) defines sexual penetration as "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."  Like section 69 considered in Smith, by its terms violation of section 288.7 subdivision (b) may occur in two ways: by oral copulation with child under the age of 10 or by sexual penetration with a child under the age of 10.

> Because violation of section 288.7 subdivision (b) can occur by way of either oral copulation with a child under 10 or sexual penetration with a child under 10, Lerma argues that, under Smith, the allegation he violated section 288.7 required an LIO instruction that would have permitted the jury to find him guilty of attempted sexual penetration in violation of sections 288.7 and 664.  This argument fails on two related grounds.  First, the accusatory pleading alleged only one means of violating section 288.7, to wit: oral copulation. Here, the district attorney's charging document alleged: "COUNT 1 - ORAL COPULATION/SEXUAL PENETRATION WITH A CHILD 10 YEARS OLD OR YOUNGER [¶]  On or about and between September 21, 2006 and August 13, 2009, DAVID DANIEL LERMA, being a person eighteen years of age and older, did unlawfully engage in oral copulation and sexual penetration, as defined in Section 289 of the Penal

Code with a child, who was 10 years of age or younger, in violation of PENAL CODE SECTION 288.7(b). [¶] <u>To wit: Defendant's tongue to Victim's vagina; while she was in elementary school and living with Defendant.</u>" In contrast to the charging document considered in <u>Smith</u>, which clearly and unambiguously alleged both ways of violating section 69, here the document expressly limits the allegation to one way of violating section 288.7, subdivision (b): oral copulation. Only by either ignoring the last sentence of the allegation, or interpreting it somehow as not limiting the scope of the allegation, can one conclude that both ways of violating section 288.7, subdivision (b) were alleged. We are not willing to engage in either such strained interpretation of count 1.

However, even if the information did not limit count 1 to oral copulation, no LIO instruction would be required here. There is not only an absence of evidence Lerma attempted to penetrate A.'s vagina within the meaning of section 289 subdivision (k)(1), but A.'s testimony suggests that in fact Lerma did not attempt to penetrate her vagina. In both instances A. described at trial, she was under 10 and naked; in both instances he threw her on the bed, put a pillow over her head, touched her vagina but did not penetrate her, and then licked her vaginal area. There is no evidence in either of these factual settings that if Lerma had any desire to penetrate A.'s vagina, A. would have been able to prevent him from doing so. Because, in both instances, instead of penetrating A.'s vagina Lerma chose to lick her vaginal area, a jury could not reasonably conclude that Lerma wanted to penetrate A.'s vagina but was somehow unable to do so.

(Not. Lodgment Attach. #11 <u>People v. Lerma</u>, D068126, slip op., ECF No. 13 <u>as modified by</u> Not. Lodgment Attach. #12, <u>People v. Lerma</u>, D068126, Order Modifying Opinion and Denying Rehearing, ECF No. 13.)

The Ninth Circuit has stated that "the failure . . . to instruct on lesser included offenses in a [noncapital] case does not present a federal constitutional question." <u>Windham v. Merkle</u>, 163 F.3d 1092, 1106 (9th Cir. 1998); <u>see also</u> <u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (holding in a noncapital case that failure of state court to instruct on lesser included offense does not alone present a federal constitutional question cognizable in a federal habeas corpus proceeding). Because there is no Supreme Court authority holding that the Constitution entitles a defendant in a

noncapital case to jury instructions on lesser included offenses, the state court's denial of the claim could not have been unreasonable. Beck v. Alabama, 447 U.S. 625, 638 n.14 (1980); see Howell v. Mississippi, 543 U.S. 440, 445 (2005); see also Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (internal quotation omitted); United States v. Rivera-Alonzo, 584 F.3d 829, 834 n.3 (9th Cir. 2009) ("In the context of a habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in [noncapital] cases.").

Furthermore, although "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the [foregoing] general rule," Solis, 219 F.3d at 929, Lerma's is not such a case. Due process does not require that an instruction be given unless the evidence supports it. See Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005). A defendant is not entitled to have jury instructions given as phrased by the defendant when the given instructions adequately embody the defense theory. United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996). To obtain relief for the state court's refusal to give an instruction, the error must have so infected the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).

Here, as the state appellate court found, there was no evidence to support an instruction on "attempted sexual penetration" in violation of California Penal Code sections 288.7 and 664. Under section 288.7(b), "Any person 18 years of age or older who engages in oral copulation or sexual penetration . . . with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life." Cal. Penal Code § 288.7(b) (West 2010). There are thus two ways to violate section 288.7(b): by sexual penetration or by oral copulation.

Lerma was charged with violating section 288.7(b) by engaging in oral copulation with A.R; the violation alleged in this case was "To wit: Defendant's tongue to Victim's vagina; while she was in elementary school and living with Defendant." (Not. Lodgment Attach. #1 Clerk's Tr. vol. 1, at 7, ECF No. 13.) Further, the jury was instructed that the allegation as to count one was based on oral copulation. Under CALCRIM No. 1128, the jury was instructed as follows:

> The defendant is charged in Count 1 with engaging in oral copulation with a child 10 years of age or younger in violation of Penal code section 288.7(b).
>
> To prove that the defendant is guilty of this crime, the People must prove that:
>
> 1.     The defendant engaged in an act of oral copulation with [A.R.];
>
> 2.     When the defendant did so, [A.R.] was 10 years of age or younger;
>
> 3.     At the time of the act, the defendant was at least 18 years old.
>
> Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun.
>
> Oral copulation is any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person. Penetration is not required.

(Id. at 85.) Given the specific oral acts alleged in count one, there was no reason to instruct the jury on "attempted sexual penetration" when there was no instruction on "sexual penetration."

Likewise, there was no evidence presented at trial that Lerma had sexually penetrated or attempted to sexually penetrate A.R. when she was ten years old or younger. "Sexual penetration" under California Penal Code section 288.7(b) is defined as follows:

/ / /

> "Sexual penetration" is the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object.

Cal. Penal Code § 289(k)(1) (West 2010). As the jury was instructed, penetration is not required under the definition of oral copulation. Mere contact is enough. People v. Dement, 53 Cal. 4th 1, 41-44, 133 Cal. Rptr. 3d 496, 533-36, 264 P.3d 292, 323-25 (2011), overruled on another ground in People v. Rangel, 62 Cal. 4th 1192, 1216, 200 Cal. Rptr. 3d 265, 288, 367 P.3d 649, 669 (2016); see also People v. Huynh, 212 Cal. App. 4th 285, 305; 151 Cal. Rptr. 3d 170, 187 (Cal. Ct. App. 2012).

At trial, A.R. specifically testified that Lerma had not penetrated or attempted to penetrate her when she was ten years old or younger. A.R. testified that one incident happened when she was about eight years old and she was living in the one bedroom mobile home. (Not. Lodgment Attach #4 Rep.'s Tr. vol. 2, at 123-24, 128, ECF No. 13.) A.R. stated that once, when she was eight or nine, she was sleeping and woke up to discover that Lerma had his hand on her vagina, over her clothes. (Id. at 130-32.) She did not testify that Lerma penetrated or attempted to penetrate her on that occasion. (Id.)

With regard to another incident, which A.R. testified happened when she was "seven or eight," (id. at 128), A.R. stated: "I went to the bedroom, and then he came to the bedroom and he put me on their bed, and he put the pillow over my face, and then he started touching me." (Id. at 126.) She testified that Lerma touched her vagina with his fingers and then licked her vagina. (Id. at 127.) She did not give any testimony about Lerma attempting to penetrate her on that occasion. (See id. at 126-29.)

Finally, she testified that when she was ten years old and in the fifth grade, she was about to take a shower when Lerma came into her room and put her on the bed. (Id. at 135-36.) He put a pillow over her face and then touched her vagina and licked it. (Id. at 138-39.) The prosecutor asked A.R. if Lerma put his fingers inside her vagina, and she stated that he had not. (Id. at 139.)

To the extent there was any evidence of sexual penetration or attempted sexual penetration, it was with regard to A.R.'s allegations (primarily made during her forensic interview and preliminary hearing testimony) that Lerma had attempted to penetrate her vagina with his penis on one or more occasion (Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 10, ECF No. 15.)  This occurred after Lerma and A.R.'s mother had divorced and Lerma had moved out of the trailer they had shared.  (Id. at 8.)  Defense counsel cross examined A.R. and referred to her preliminary hearing testimony; A.R. stated that this happened on the day they visited Legoland, when she was twelve years old.  (Not. Lodgment Attach. #4 Rep.'s Tr. vol. 2, at 239-42, ECF No. 13.)  In the forensic interview, A.R. described the attempted penetration as happening at the Vista townhouse Lerma shared with Jennifer when A.R. was twelve years old.  (Not. Lodgment Attach. #2 Clerk's Tr. vol. 2, at 292-93, ECF No. 13; Not. Suppl. Lodgment Attach. #1 [Clerk's transcript excerpts], at 8-9, ECF No. 15.)

There was no evidence presented at trial that Lerma had penetrated or attempted to penetrate A.R. when she was ten years old or younger.  For that reason, the trial court's failure to instruct on "attempted penetration" under California Penal Code sections 288.7 and 664 did not render Lerma's trial fundamentally unfair.  See Dunckhurst, 859 F.2d at 114.  The state court's denial of the claim was therefore neither contrary to, nor an unreasonable application of, clearly established law.  See 28 U.S.C.A. § 2254(d); Williams, 529 U.S. at 407-08.  The Court **RECOMMENDS** the claim be **DENIED.**

### C.    Request for Evidentiary Hearing

Lerma asks this Court to conduct an evidentiary hearing on his claims. (See Third Am. Pet. 11, ECF No. 8.)  Petitioner does not, however, identify what evidence, if any, he intends to present.  Lerma's request is foreclosed by the Supreme Court's decision in Cullen v. Pinholster, 563 U.S. 170 (2011).  There, the Supreme Court held that where habeas claims have been decided on their merits in state court, a federal court's review under 28 U.S.C.§ 2254(d)(1) -- whether the state court determination was contrary to or an unreasonable application of established federal law -- must be confined to the record

that was before the state court.  <u>Pinholster</u>, 563 U.S. at 181-82.  The Court specifically found that the district court should not have held an evidentiary hearing regarding Pinholster's claims of ineffective assistance of counsel until after the lower court determined that the petition survived review under § 2254(d)(1).  <u>Id.</u>

For the reasons discussed in Sections V(A)-(B) of this Report and Recommendation, none of Petitioner's claims survive review under § 2254(d). The Ninth Circuit has stated that "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief." <u>Sully v. Ayers</u>, 725 F.3d 1057, 1075-76 (9th Cir. 2013).  Accordingly, Lerma's request for an evidentiary hearing is **DENIED.**

## VI.     CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Larry Alan Burns under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties **no later than April 30, 2019**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties **no later than May 17, 2019**.  The parties are advised that failure to file objections within the specified time may waive the right to

/ / /

/ / /

/ / /

/ / /

/ / /

raise those objections on appeal of the Court's Order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED:  March 28, 2019

_____
Ruben B. Brooks
United States Magistrate Judge